## 25751. JOHNSON v. THE STATE.

SUBMITTED APRIL 14, 1970—DECIDED MAY 21, 1970.

*Marvin L. Bridges,* for appellant.

*W. J. Forehand, District Attorney, Arthur K. Bolton, Attorney General, Harold N. Hill, Jr., Executive Assistant Attorney General, Marion O. Gordon, Assistant Attorney General, Charles B. Merrill, Jr.,* for appellee.

GRICE, Justice. This appeal is from a judgment of conviction and sentence to death for murder, and from denial of a motion for new trial. The appellant is Johnny B. Johnson, who was indicted by the Grand Jury of Worth County and tried in the superior court of that county for the slaying of James H. Emerson by shooting him with a shotgun.

The motion for new trial is upon the general grounds only.

The first enumeration of error complains of its denial. Enumerations 2, 3, and 4 set out the general grounds as separate enumerations. Enumeration 5 complains that the verdict of guilty, necessitating the sentence of death by electrocution and thus subjecting the appellant to cruel and inhumane punishment, is contrary to law and to the principles of justice and equity, and is without evidence to support it.

The evidence, insofar as necessary to recite here, was that which follows.

A city councilman testified that between 9 and 9:30 p.m. on the night in question a neighbor of the defendant came to his home and requested that he accompany him back to his home; that there the witness found that James H. Emerson, the only policeman of the town of Warwick, had been shot to death; that the deceased was lying on his back on the ground almost even with the back porch of the neighbor's house; that the deceased's police car was parked in the street at a house next to the neighbor's with its lights burning; that the deceased had a hand gun in its holster and a shotgun lying between his legs;

that the witness remained at the scene until officers arrived; and that the neighbor showed one of the officers where he had heard someone jump off his back porch.

The neighbor testified in essence that on this occasion he and two other men at his home heard a gun fire; that they went to the door and saw the police car proceed up the street, turn around and come back in front of the witness's house, where the policeman parked the car and got out, leaving the lights on and shining down the street. The witness also testified that he told the policeman "You must have killed a dog," and the policeman replied, "Naw, a dog like to got me . . . somebody shot at me . . . they was close by your house." The witness then told the policeman that he would go around the house and look. Thereupon, the witness and the policeman, the latter armed with a shotgun and a pistol and carrying a light, walked together around the house toward the back. When they reached the back porch the witness reached to pull up and jump on the porch. At that moment a gun fired. The witness felt the burn of it, but did not know who fired it. The policeman fell to the ground. The witness then ran back to the front of his house, went in, and told the two men that someone had killed the policeman. The witness then heard someone leave his back porch. The witness stayed in the house from five to ten minutes and then went to the home of the councilman, told him of what happened and they returned to the scene. The witness had seen the defendant that afternoon and talked with him, but the defendant mentioned no trouble with his wife or with the deceased. The witness stated that when he first heard a shot it sounded as if it came from between his and the defendant's house.

A 13-year-old boy testified that before the shooting the defendant came to his house and asked where his wife was; that the defendant got his gun when told that she had gone off; that the defendant then went outside; that he heard a shot and then another one; that the defendant's wife came back, asked what was wrong and requested that the boy go outside with her; that they saw the defendant in the road by the police car and the defendant said "Halt," aiming the gun in the

direction of the boy; that the boy said, "This is me, Johnny B."; and that the defendant then ran toward his own house and he did not see him anymore.

A law enforcement officer testified that they located the defendant some 200 yards from where the deceased was lying; that the defendant's shotgun was in three pieces; that he found three shells in the defendant's pocket; and that the dog handlers had obtained two shells.

One of the dog handlers testified that the shotgun fell apart when he took it from the defendant; that some buckshot shell fell out; and that the defendant offered no resistance.

A deputy sheriff testified that he took the defendant to Tifton to the State Patrol station; that there he informed him of his constitutional rights; and that the defendant said he understood, signed a waiver and was then questioned. He stated that the defendant told him that he came home and his wife was gone so he got a gun and shells and went out to shoot her; that while he was between his house and that of the neighbor the gun went off accidentally as the police car went by; and that because of this he ran over to the neighbor's house to hide on his back porch. He also said that the defendant told him that when the policeman came around the house toward the back porch he heard him "reverse his gun" and shot him; and that he heard the policeman say "Hold it" the instant before he shot him, and knew whom he was shooting. He testified that the defendant also told him that after the shooting he went back to his house, got some money from his wife and four more shells; that he then went to the vicinity of an old sawdust pile where he waited awhile before going to the place where he was found and arrested. When apprehended, the defendant had a loaded shotgun in his hands. He testified that the gun was dilapidated, that it was necessary to hold it together to shoot it, and that the gun might accidentally fire easily and one would have to be very careful with it. He stated that he found an empty shell at the back of the neighbor's house and another on the side of it.

A representative of the State Crime Laboratory testified that he found a shotgun wound in the deceased's neck; that this

caused his death; that he received the gun in question and two cartridge cases from the sheriff; that he tested the gun and found the cartridge cases matched those given him by the sheriff, thus determining that the cases were fired by that gun; and that he estimated the distance between the gun muzzle and the body of the deceased to have been from 10 to 15 feet.

The defendant in his unsworn statement said, substantially, that he picked up his gun and went out in the woods; that the policeman came by and he got behind a stump; that when the policeman went by the defendant's gun went off; that the policeman went up the road and came back; and that the defendant tried to get on the neighbor's porch and to go in his house; that he was coming around the house and the policeman was so close to him that he was afraid the policeman was going to shoot him; and that he was not intending to kill him and was sorry that he was killed; and that it was not his intention.

■ The foregoing evidence supported the finding of guilty by the jury.

■ The punishment imposed, death by electrocution, has been held by repeated decisions of this court not to be such cruel and inhumane punishment as is forbidden by the Constitution. *Furman v. State*, 225 Ga. 253 (4) (167 SE2d 628), and citations.

Since none of the enumerations of error is meritorious, the judgment of the trial court is

*Affirmed. All the Justices concur.*